UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MOONSHADOW MOBILE, INC., an
Oregon corporation,

               Petitioner/Cross-Respondent,

  vs.

LABELS & LISTS, INC., a Washington
corporation

               Respondent/Cross-Petitioner.

_____

Case No. 6:23-cv-01716-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

From June 3, 2022 to August 25, 2023 Petitioner, Moonshadow Mobile, Inc.

("Moonshadow"), and Respondent, Labels & Lists, Inc. ("L2"), engaged in arbitration to resolve

a business dispute before the Arbitration Services of Portland ("ASP"). After extensive briefing

and a nine-day arbitration hearing, the arbitration panel issued an award for Moonshadow on

October 25, 2023. Moonshadow now petitions the Court to confirm the award, and L2 moves to

vacate it. For the reasons that follow, Moonshadow's Petition For Order Confirming Arbitration

Awards (Notice of Removal Ex. A, ECF No. 1) is DENIED, and Respondent's Motion to Vacate

(ECF Nos. 14 and 18) is GRANTED.

## BACKGROUND

The parties briefed this matter extensively, and the Court considered their motions at length over four days of oral argument. Because the procedural background and merits of the underlying arbitration are key to several of the Court's findings, the Court provides a thorough recap of the facts.

## I.     The Parties' Relationship

L2 is a nonpartisan political data company headquartered in Bothell, Washington. L2 sells voter and consumer data to political campaigns, government offices, news organizations, and universities. The biggest part of L2's business is providing highly processed voter data. In doing so, L2 sends its customers large text files that the customers then load into their own databases to filter, sort, query, and use as they wish. Moonshadow is a small technology company that specializes in visualizing large databases in online mapping environments. Prior to 2010, Moonshadow created eCommerce database technology for large databases with over 10 million products. Excerpts of the Arbitration Record ("EAR") 1131:9, ECF Nos. 32, 33, and 34.[1]

L2's main product—files of data—had been saleable only to large, sophisticated customers that have their own databases. In 2009, L2 saw that its competitors were offering smaller customers a new kind of web-based functionality that was available at any time to paying customers. With this functionality, customers who did not have their own databases would be able to access a commercial website, buy data from an online store, and sort, filter, and create lists from the data using the web-based platform.

---

[1] EAR 2–721, EAR 722–4297, and EAR 4301–5452 can be found in ECF Nos. 34, 33, and 32, respectively.

Just as L2 was considering development of an online store, it was contacted by a tech startup called Moonshadow. At the time, Moonshadow was looking for a source of political data to use in a new mobile application it was developing: a political campaign canvassing app called Ground Game. L2 realized that Moonshadow might have the ability to build the online store that L2 had envisioned. L2 also saw in Moonshadow's Ground Game application the potential to display voter data on a dynamic visual map. Excited by this potential, L2 hired Moonshadow to build a "Geo-Visual Sales System" (or "Sales System"). The two businesses entered into a work-for-hire technology development agreement in 2010.

## II.     The Contract: "Development & Hosting Agreement"

In late 2010, the parties entered into an initial "Development & Hosting Agreement" (the "DHA"). In 2015, once the Sales System was up and running, L2 and Moonshadow renegotiated elements of their contract. The 2015 DHA was the parties' operative contract until it expired at the end of 2022 after L2 timely notified Moonshadow in March 2022 of its election to not renew its contract.

Under the DHA, L2 hired Moonshadow to build, host, and maintain an online portal for its customers. There were three primary ways that L2 would pay Moonshadow for the development and hosting services Moonshadow would provide: (1) hourly—Moonshadow would bill L2 for the hourly work its employees spent creating and servicing the platform; (2) licensing fee—Moonshadow would bill L2 a monthly licensing fee for use of the back-end Moonshadow-owned database technology that was separate from the user interface; and (3) commissions—L2 would pay Moonshadow commissions for data purchased and delivered to customers who used the platform Moonshadow had created.

L2 also intended to offer its data-file customers with access to the platform as an incidental service. These customers (like The New York Times) bought data directly from L2 to load into their own databases. L2 gave them access to the mapping tool to explore the visual application.

The DHA defined the scope of commissions Moonshadow was to receive.

4. Political Data Revenue Share. Moonshadow shall receive a commission on Client revenue derived from the sale of political data purchased, delivered and subscribed for through the Moonshadow Geo-visual Sales System in the following way:

- In Odd Years (2015, 2017, etc.). 15% of any revenue over $1.2 Million in annual sales.
- In Even Years (2016, 2018, etc.). 15% of any revenue over $2.0 Million in annual sales

"Notwithstanding anything herein to the contrary, all subscription revenue and revenue from data sold through VoterMapping, ConstituentMapping or Client API's using Moonshadow Technology shall be included in the calculation to meet the above minimums . . . ."

DHA (EAR 20).

## III.    The Parties' Ownership of Intellectual Property.

The DHA also reflected the parties' effort to assign the intellectual property associated with the development of the VoterMapping platform. EAR 13–14. The parties negotiated and agreed to a division of intellectual property in late 2010. To "give[] [L2] the protection you are looking for," Mr. Boesjes proposed a solution in which L2, in the event of a split with Moonshadow, would have "the right to use the complete solution for its continuing business." *Id.* At the arbitration hearing, the parties disputed whether L2 violated the terms of the DHA and committed trade secrets violations by stealing proprietary information from Moonshadow. The DHA described the parties' respective intellectual property rights, and identified L2 as either owning or having a perpetual royalty-free right to seven of the components of the product

Moonshadow had created for L2. The DHA also outlined Moonshadow's exclusive intellectual property. The Agreement described the "Visualization Server" and the "Data Import Server" as belonging to Moonshadow. *Id.* (EAR 22). This framework of intellectual property ownership was reaffirmed in the 2015 DHA, which incorporated the 2010 "Description." *See Id.* (EAR 22–26).

### IV.    L2's Decides to Separate from Moonshadow

By 2015, based on difficulties that had arisen with VoterMapping and in the parties' relationship, L2 decided it would part ways with Moonshadow. L2 first offered to purchase Moonshadow so that it could fully control its Geo-Visual Sales System. But Moonshadow rejected L2's offer. Under the DHA, L2 had secured the right to use all components of the Geo-Visual Sales System post-separation, except two specified components. It had also secured Moonshadow's promise to assist L2's transition should L2 attempt to replace Moonshadow with a different vendor. Under these circumstances, L2 hired an in-house software engineer to build a new version of its Geo-Visual Sales System for itself. Originally called VoterMapping 2.0 in L2's internal communications, L2's new website application was eventually named "DataMapping."

### V.    L2 Develops the DataMapping Platform

At the end of 2015, L2 hired a software developer, Jim Greene, to create an in-house platform that could replace the platform it contracted Moonshadow to build. The replacement was built over six years and was based on a high-speed database technology offered by a company called MapD. Mr. Greene was directed to replicate the functionality of the Geo-Visual Sales System to the best of his ability, and to improve where possible. *See* Hearing Transcript (EAR 1782:6–9). Mr. Greene was given login access to VoterMapping. *See id.* (EAR 1808:13–

15). He was also given access to VoterMapping usage statistics that Moonshadow had provided to L2. *See id.* (EAR 1848:11–14).

In addition to hiring Mr. Greene, L2 also hired a Moonshadow employee, Sergei Bogdanov in 2016. Sergei Bogdanov is a computer engineer who worked at Moonshadow for several years prior to being hired by L2 in 2016. Over the course of his employment at Moonshadow, Mr. Bogdanov's role had evolved into working almost exclusively to support L2 in uploading its new voter data into the Geo-Visual Sales System. He was the only Moonshadow employee who had the training and experience to consistently accomplish this task. The parties disputed whether Mr. Bogdanov was subject to a non-compete agreement. *See id.* (EAR 3782, 3786). Moonshadow ultimately demanded, and L2 paid, $45,000 for Moonshadow to release Mr. Bogdanov from the disputed non-compete. *See* Ex. 1152 (EAR 3782), Ex. 1156 (EAR 3792–93).

## VI.    L2 prepares to launch DataMapping.

Once the new DataMapping platform was built, L2 exported its customers' data from the old VoterMapping platform, and loaded it into the new platform. The data were about L2's customers, such as customer usernames, customer purchases, and drafts of the customers' own work on the platform. By exporting customers' data, L2 allowed their customers to continue ongoing projects using Labels & Lists IDs ("LALIDs"). These LALIDs were grouped as a set by L2's customers and contained information about who customers were and what they had purchased. L2 posted about the transfer of its customer data on its public website and communicated with customers about how their account information and work product would be available in the new platform. *See* Ex. 450 (EAR 4232).

Moonshadow brought contract and trade secrets claims against L2 for its decision to (a) develop a replacement system based on the underlying functionality of the Geo-Visual Sales

System and (b) port over its customer data from the Geo-Visual Sales System. At the evidentiary hearing, Moonshadow sought upwards of $49 million for these claims. *See* Ex. 462 (EAR 4241). Moonshadow alleged that L2 accessed, copied, disclosed, extracted, transferred and delivered Moonshadow's Confidential Information and Host Materials in developing DataMapping (also known by L2 as VoterMapping 2.0), and that it migrated and deployed L2's new system using Moonshadow's proprietary information. Transcript of Arbitration Hearing from August 15, 2023 (EAR 1090–91); Ex. 295 (EAR 5045–47).

## VII.    L2 Launches DataMapping and Ends Relationship with Moonshadow

In March 2022, L2 launched its homegrown platform "DataMapping" and sent a nonrenewal notice to Moonshadow. The notice informed Moonshadow that L2 had switched its customers over to its new technology and would not be renewing its licensing agreement at the end of 2022 when the contract expired. When, on March 20, 2022, L2 notified Moonshadow that it was not renewing the DHA, it also communicated to Moonshadow that L2 no longer planned to pay a third party the $20,000/month price for the server space that hosted the Geo-Visual Sales System and that Moonshadow could assume the payments if it wished. *See* Ex. 1314 (EAR 3961).

In response to L2's nonrenewal notice, Moonshadow made a series of demands. Among them was a demand that L2 not take any steps to shut down the servers that hosted the VoterMapping website. Prior to the third-party servers being shut down, Moonshadow completed a full "back-up" of the data on the servers in May 2021. And in late March 2022, shortly before the servers went offline, L2 backed up the majority of useable data from the servers in the form of "csv" text files. These files included data showing all logins into the Geo-Visual Sales System, customer-assigned universes of voter data, surveys, users, and shape files.

On March 27, 2023, the servers were shut down, and L2 ceased having any access to VoterMapping.

## PROCEDURAL BACKGROUND

On June 3, 2022, Moonshadow initiated the underlying arbitration action with the Arbitration Service of Portland. The Statement of Claim alleged two types of contract breaches by L2: (1) underpayment of commissions and (2) misappropriation of intellectual property in development of L2's new "DataMapping" platform. *See* Claimant's Statement of Claim (EAR 702–18). Moonshadow sought $3.3 million in damages. *See id*. In October 2022, L2 filed a Motion to Make More Definite and Certain to better understand the claims it was defending against. *See* L2's Motion to Make More Definite and Certain (EAR 696). The Chief Arbitrator declined to require Moonshadow to plead its claims with greater certainty because ASP rules did not require specificity in pleadings. *See* Isaak Decl. ¶ 5 ECF No. 20-1. The Chief Arbitrator granted L2's Motion to Make More Definite and Certain in part by deciding that one of Moonshadow's declarations filed in response to another L2 motion added to Moonshadow's Statement of Claim. *See* Chief Arbitrator Order (Nov. 16, 2022) (EAR 613). Also in October 2022, L2 filed its Answer, Affirmative Defenses, and Counterclaim in which it alleged Moonshadow had failed to pay certain amounts owed to L2 under the DHA.

Both parties amended their arbitration claims during the arbitration proceedings. L2 amended its Answer to add a common-law fraud claim in April 2023. L2 based the fraud claim on "serial misrepresentations" made by Moonshadow and Mr. Boesjes related to charges that Moonshadow and Mr. Boesjes knew were unsubstantiated or otherwise fraudulent. *See* L2's Third Amended Answer, Affirmative Defenses, and Counterclaims ¶¶ 25–27 (EAR 594–95). In May 2023, Moonshadow amended its Statement of Claim to add trade secrets and fraud claims.

*See* Moonshadow's Motion to Amend (EAR 574). L2 opposed Moonshadow's Motion to Amend because it believed Moonshadow's new allegations remained insufficiently clear such that L2 could not ascertain what L2 had allegedly done that was fraudulent. *See* L2's Response in Opposition to Moonshadow's Motion to Amend (May 26, 2023) (EAR 569–70) (describing Moonshadow's claims that L2 misappropriated Moonshadow's confidential information as based on "unspecified confidential information"). L2 explained that, even after reviewing Moonshadow's Amended Statement of Claim, "L2 does not know what confidential information Moonshadow thinks L2 shared[.]" *Id.*

The parties' arbitration hearing began on Monday, August 14, 2023 and went until Friday, August 25, 2023, excluding Monday, August 21, 2023.

As Claimant, Moonshadow opened with its case. Moonshadow called as fact witnesses Bruce Willsie, Eimar Boesjes, and Jim Green. It also called Gary Olson and Stuart Faulk as expert witnesses. Moonshadow's case began the afternoon of August 14—after opening statements—and continued until Tuesday morning, August 22.

Given the amount of time Moonshadow had taken to put on its case, the Chief Arbitrator reassured L2 that the only impact of Moonshadow's long case would be on Moonshadow's rebuttal case. L2 called as fact witnesses Hiedi Carman, Terra McLaughlin, Paul Wescott, Peter Gabel, and Bobby Hymel, and recalled Mr. Willsie. L2 also called as expert witnesses William Holmes and Professor Michael Risch. Despite the Chief Arbitrator's earlier assurances that L2 would be permitted to put on its full case, the Chief Arbitrator required L2 to conclude its case on the morning of Friday, August 25.

The Chief Arbitrator then gave Moonshadow time to put on a rebuttal case in which it recalled its expert witnesses and Mr. Boesjes. Moonshadow was given more than five days to put on its case while L2 was given three days.

With only three hours remaining in the time allotted for the hearing, the Chief Arbitrator limited the parties' closing arguments to 90 minutes each. L2 had sought to file closing briefs, but the Chief Arbitrator denied this request. Nonetheless, during its closing arguments, Moonshadow handed to the panel members a closing written submission that provided additional legal authority. L2 requested the opportunity to respond to Moonshadow's closing submission, and the Chief Arbitrator denied that request.

On September 1, 2023, the panel provided its Opinion and Preliminary Award. The Opinion identified Moonshadow as the prevailing party and requested that Moonshadow submit its statement of attorney fees. Moonshadow did so on September 13, requesting $3,272,727.27 in fees. *See* Fee Statement (EAR 187). L2 responded on October 4, identifying the high end of the lodestar amount as $644,203.73. *See* Objections to Fee Statement (EAR 34). The panel heard oral argument on the fee issues on October 13. On October 25, 2023, the panel majority issued the Award. *See* Award (EAR 2–4).

On October 30, 2023, Moonshadow filed a petition to confirm the arbitration award in Lane County Circuit Court. ECF No. 1, Ex. A. On November 20, 2023, L2 timely removed the case to federal court based on diversity jurisdiction. ECF No. 1. L2 gave timely notice of its motion to vacate the Final Award under 9 U.S.C. § 12. *See* ECF Nos. 2, 14.

/ / /

/ / /

/ / /

## STANDARD OF REVIEW

Under the Federal Arbitration Act ("FAA") the Court must confirm an arbitration award unless it vacates, modifies, or corrects the award as prescribed in 9 U.S.C. §§ 10 and 11. The FAA permits vacatur on various grounds, including, as L2 raises here:

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10 (a)(3)–(4).

Arbitrators "exceed their powers" under § 10 (a)(4) when an award "is completely irrational or exhibits a manifest disregard of law." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997 (9th Cir. 2003) (en banc) (cleaned up). "An award is completely irrational 'only where the arbitration decision fails to draw its essence from the agreement.'" *Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1166 (9th Cir. 2019) (quoting *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1288 (9th Cir. 2009)). The bar for vacatur under § 10 (a)(4) is high. "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award under the statute, which is unambiguous in this regard." *Kyocera Corp.*, 341 F.3d at 994. "It is not enough . . . to show the panel committed an error or even a serious error." *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 641 (9th Cir. 2010) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)).

Section 10(a)(3) of the FAA further provides that an award may be vacated where arbitrators "refus[e] to hear evidence pertinent and material to the controversy; or [because] of

any other misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(a)(3). In determining whether an arbitrator's misbehavior or misconduct prejudiced the rights of the parties, courts ask whether the misconduct or misbehavior deprived the parties of a fundamentally fair hearing. *See, e.g., U.S. Life Ins. Co. v. Superior Nat. Ins. Co.*, 591 F.3d 1167, 1177 (9th Cir. 2010) ("In short, perhaps [petitioner] did not enjoy a perfect hearing; but it did receive a fair hearing. It had notice, it had the opportunity to be heard and to present relevant and material evidence, and the decisionmakers were not infected with bias.") (citation omitted). An arbitration hearing is "fundamentally fair" if it meets "the minimal requirements of fairness— adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." *Sunshine Min. Co. v. United Steelworkers of Am., AFL-CIO, CLC*, 823 F.2d 1289, 1295 (9th Cir. 1987).

A court is limited to reviewing an arbitrator's award on the grounds enumerated in the FAA. "These grounds afford an extremely limited review authority, a limitation that is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures." *Kyocera*, 341 F.3d at 998. "The burden of establishing grounds for vacating an arbitration award is on the party seeking it." *U.S. Life Ins. Co.*, 591 F.3d at 1173. The party seeking vacatur must prove prejudice. "A showing of prejudice is a prerequisite to relief based on an arbitration panel's evidentiary rulings." *Id.* at 1174 (citing *Burchell v. Marsh*, 58 U.S. 344, 350 (1854) (to warrant reversal because of an arbitrator's mistake in the conduct of the hearing, a party must show that "if it had not happened, [the arbitrator] should have made a different award")).

/ / /

/ / /

/ / /

## DISCUSSION

### I.        Choice of Law

In this case, the parties dispute whether the Federal Arbitration Act ("FAA") or Oregon state law provides the appropriate standard of review for the petitions to confirm or vacate the underlying arbitration award.

The parties' agreement is a contract "evidencing a transaction involving commerce" that comes within the purview of the FAA. *See* 9 U.S.C. § 2. "When an agreement falls within the purview of the FAA, there is a strong default presumption that the FAA, not state law, supplies the rules for arbitration. To overcome that presumption, parties to an arbitration agreement must evidence a 'clear intent' to incorporate state law rules for arbitration." *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1066 (9th Cir. 2010) (citations, internal quotation marks, and internal modifications omitted).

A general choice-of-law clause within an arbitration agreement does not exhibit the clear intent necessary to trump the presumption that the FAA supplies the rules for arbitration. *Sovak v. Chugai Pharm. Co.,* 280 F.3d 1266, 1270 (9th Cir. 2002), *opinion amended on denial of reh'g*, 289 F.3d 615 (9th Cir. 2002). Rather, courts interpret general choice-of-law provisions as "simply supplying state substantive, decisional law, and not state law rules for arbitration." *Id.*

Here, the DHA contains a general choice of law provision that selects Oregon substantive law, but has no specific language about what law should apply to arbitration, which is not enough to overcome the presumption that the FAA applies. In relevant part, the DHA provides that "[t]his agreement shall be governed in all respects by the laws of the state of Oregon without regard to its conflict of law provisions." *See* DHA (EAR 17, § 11.7). Although Moonshadow argues otherwise, *see* Resp. Br. 18, the DHA's arbitration provision contains no "clear intent" (or

any intent) that the Oregon arbitration act would control. *See id.* The DHA's arbitration provision refers only to the rules of the Arbitration Service of Portland, *see* DHA (EAR 17, § 11.8), which, in turn, express no preference as between the FAA and the Oregon act. *See* ASP Procedural Rules (EAR 42, ¶ 41) ("Any arbitration conducted under these rules is subject to the provisions of Oregon's version of the Revised Uniform Arbitration Act (ORS 36.600 through ORS 36.740) and the Federal Arbitration Act (9 USC Sections 1–14), whichever statute applies[.]"). Under *Johnson*, the FAA governs this Court's review.

## II.    Vacation of The Arbitration Awards – 9 U.S.C. § 10(a)(3)

The Court must confirm the arbitration award unless it is vacated on the grounds raised in L2's motion. L2 argues that the arbitration award should be vacated under 9 U.S.C. § 10(a)(3) and (4) for several reasons. L2 contends that the arbitration panel exceeded its powers, issued an award that exhibits a manifest disregard of the law, refused to hear material and pertinent evidence, and engaged in repeated behavior that both independently and cumulatively resulted in a fundamentally unfair arbitration. For the reasons below, the Court finds the underlying arbitration proceeding was fundamentally unfair to L2 and Orders the arbitration award vacated under 9 U.S.C. § 10(a)(3).[2]

To prevail on its motion to vacate under Section 10(a)(3), L2 must show that the arbitration panel held a "fundamentally unfair" hearing, *i.e.* that the arbitrators either "refus[ed] to hear evidence pertinent and material to the controversy" or prejudiced L2's rights during the arbitration. 9 U.S.C. § 10(a)(3).[3] The Ninth Circuit has defined a "fundamentally fair" hearing

---

[2] Because the Court finds that L2 met its burden for vacatur under Section 10(a)(3), the Court does not consider L2's arguments that the arbitration panel exceeded its authority under Section (a)(4).

[3] The parties dispute whether the party seeking vacatur under Section 10(a)(3) must show some sort of ill-will on the part of the arbitrator. *Compare* Day 4 Hearing Transcript 122:14 – 126:22 (L2's argument that it does not have to argue ill-will or intentional conduct to show fundamental

under the FAA as one where the parties had notice, the opportunity to be heard and to present relevant and material evidence, and the decisionmakers were not infected with bias. *U.S. Life Ins. Co.*, 591 F.3d at 1173. The court finds that each of the bases L2 raises in its motion individually rendered the underlying proceeding fundamentally unfair, and that these unfairnesses prejudiced L2 in the result.

In its Opening Brief and at oral argument, L2 raised several grounds that the panel violated Section 10(a)(3) of the FAA and created a prejudicially unfair hearing. Specifically, L2 argues the panel permitted a fundamentally unfair hearing (1) "in its treatment of L2's counterclaims," (2) "with respect to its unjust enrichment award for Moonshadow's trade secret, fraud, and breach of confidentiality claims," and (3) for several evidentiary and procedural decisions made by the panel during the course of the hearing. L2's Opening Brief 89–116, ECF No. 18. The Court takes up these allegations in turn.

### A.    L2's Counterclaims

L2 first argues that the panel majority's decision to dismiss L2's common-law fraud claim based on a pleading defect, without providing L2 notice or an opportunity to respond, was fundamentally unfair. Rule 1.B of the Arbitration Rules of Arbitration Service of Portland provide the pleading standard for the parties. EAR-27 ("The Statement of Claim shall <u>summarize</u> the basis of the claim the relief sought, the dollar amount of any money demand…." (emphasis in

---

unfairness) *with* Moonshadow's Sur-Reply at 14, ECF No. 45 (quoting *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 40 (1987), where the Supreme Court found that under Section 10(a)(3), federal courts are empowered to set aside arbitration awards only where an arbitrator's error was "in bad faith or so gross as to amount to affirmative misconduct"). The Court agrees with L2. A separate section of the FAA—10(a)(2)—deals with circumstances of unfair partiality or bias. Section 10(a)(3) does not require any such finding of bad faith or malintent, and the Court emphasizes that it does not attribute any ill will or malintent to the arbitration panel here.

original). L2's Statement of Claim described its fraud claim as one where "Moonshadow and Mr. Boesjes made serial misrepresentations in the invoices they issued L2," and that, "[a]s a direct and proximate result of L2's reliance on Moonshadow and Mr. Boesjes material misrepresentations, L2 has been damaged in an amount to be proven at trial, including but not limited to, invalid charges paid by L2 for billable hours that were unnecessary or fabricated by Moonshadow and Mr. Boesjes, charges paid by L2 for unapproved projects, charges that should have either been split or entirely paid for by Moonshadow, and otherwise unsubstantiated or fraudulent charges to L2." L2 Statement of Claim ¶¶ 25, 29 (EAR 594–95). During the arbitration proceeding, L2 put on evidence that Moonshadow made material misrepresentations about the existence of a non-compete agreement, which Moonshadow knew to be false, and that L2 relied on those misrepresentations. EAR 1701–02 at 980:24–981:2, EAR 2759 at 2038:15–17, Ex. 1156 (EAR 3794), Ex. 1359 (EAR 4003).

The panel's award found that "L2 takes nothing by way of its counterclaims," noting that one of the arbitrators dissented and would have awarded L2 $45,000 on its fraud claim. EAR-2. In the opinion, the panel repeated that "L2 takes nothing on its fraud claim," including the explanation that "L2 did not plead its $45,000 fraud claim arising out of the Sergei Bogdanov Release Agreement at all much less with particularity." EAR-9. Although it found that L2 "takes nothing by way of its counterclaims," including fraud, the opinion also found that "[t]he Sergei Bogdanov Release Agreement had value to L2 in the amount of $25,000 even without the existence of a non-compete," and awarded L2 an "offset" against damages. The panel found L2 otherwise owed Moonshadow on other claims. Opinion ¶¶ 21, 22 (EAR 7-9).

The Court finds it was fundamentally unfair for the panel to dismiss L2's fraud claim. Under Section 10(a)(3), an arbitration award may be vacated if the arbitrator's actions prejudice

the rights of a party. Here, the panel prejudiced L2 by applying a strict pleading requirement (on its own motion) to L2's fraud claim without offering L2 a chance to respond. As noted above, the ASP pleading rules are more permissive at every step than the equivalent Oregon and federal rules. For instance, L2 was required under ASP rules only to "summarize the basis of its claim." It had no obligation to identify its claims of fraud with particularity. Yet the panel majority deviated from ASP rules and applied a pleading standard to L2's common-law fraud claim even more stringent than would have been applied under Oregon and federal rules. What is more, it did not provide L2 with notice or an opportunity to respond. *U.S. Life Ins. Co.*, 591 F.3d at 1173 (identifying notice and a chance to respond as elements of a fundamentally fair hearing). Although the panel appeared to actually consider the underlying evidence of L2's fraud claim concerning the Bogdanov agreement (and awarded it $20,000 in damages on the basis of its theory), it was fundamentally unfair for the panel to dismiss the claim in the fashion it did, especially given the permissive ASP pleading rules. This is a sufficient ground to vacate the underlying award, and the Court grants L2's motion to vacate on this basis.

### B. Moonshadow's Claims

L2 also argues that the panel majority prejudiced its rights in its handling of Moonshadow's trade secrets claims throughout the arbitration. In May 2023, Moonshadow moved to amend its Statement of Claim to add trade secrets and fraud claims. *See* Moonshadow's Motion to Amend (EAR 574–80). L2 opposed Moonshadow's Motion to Amend and explained to the Chief Arbitrator—both in its brief and at the hearing on the motion—that Moonshadow's new allegations left L2 in the dark as to what Moonshadow was claiming. *See* L2's Response in Opposition to Moonshadow's Motion to Amend (EAR 570). Over L2's objection, the Chief Arbitrator granted Moonshadow's Motion to Amend without prejudice to

L2's ability to argue for dismissal of the claims due to prejudice caused by Moonshadow's late addition of these claims. *See* Chief Arbitrator Order (June 8, 2023) (EAR 538). Moonshadow's newly-added Federal and State trade secrets claims alleged L2 misappropriated its "valuable trade secrets in its proprietary database of universe compilations, as well as algorithms, tools and proprietary techniques for accessing, translating, importing, exporting, annotating and coding data." EAR 545, 547. Despite the relaxed pleading standards under ASP rules (which should have applied to L2's fraud claim, and allowed it to present evidence of fraud under the Bogdanov agreement that was not specifically pled), L2 argues the panel lifted the particularity requirement when it came to Moonshadow's trade secrets claims, which hamstrung L2's ability to defend itself in the evidentiary hearing against these claims.

The Court finds that the panel's handling of Moonshadow's trade secrets claims prejudiced L2's rights, and rendered the arbitration fundamentally unfair. Under Section 10(a)(3) of the FAA, an arbitration panel's award can be vacated if either party did not have notice, the opportunity to be heard, or to present relevant and material evidence. *U.S. Life Ins. Co.*, 591 F.3d at 1177. Here, L2 had advance notice of Moonshadow's trade secrets claims in its Amended Statement of Claim and the hearing memoranda. *See* Moonshadow's Trial Br. (EAR 369), Amended Statement of Claim (EAR 545, 547), Moonshadow's Supplemental Hearing Memorandum (EAR 223). But neither the Statement of Claim nor the Memoranda provided the particularity in pleading typically required of plaintiffs presenting trade secrets claims. For instance, Moonshadow included in its list: "metadata, shape files, auxiliary data and relationships between objects including customers, users, datasets, universes and shape files to design, test and deploy the DataMapping system." (EAR 224). The panel did not respond to L2's objections to these overly-broad assertions. This meant L2 entered the evidentiary hearing without knowing

what proprietary information Moonshadow was claiming as the basis for its trade secrets misappropriation claims. This prejudiced L2's ability to prepare evidence and expert testimony that would rebut Moonshadow's claims. In particular, the level of generality the panel allowed with respect to Moonshadow's claims prevented L2 from preparing its expert, Professor Michael Risch, from testifying to specific trade secrets beyond the background norms and expectations for intellectual property in a relationship like that between L2 and Moonshadow. *See generally* Hearing Transcript (EAR 2576–2671). This failure to hold Moonshadow to the expectation of pleading trade secrets claims with particularity prejudiced L2's defense, inhibiting any advanced notice of those claims and preventing L2 from preparing relevant material in defense during the hearing.

### C.     Evidentiary Decisions During the Arbitration

"[A]n arbitration award may be vacated if the proceedings violate the rule of fundamental fairness." *Costco Wholesale Corp. v. Int'l Bhd. of Teamsters, Loc. No. 542*, 850 F. App'x 467, 468 (9th Cir. 2021)., 850 F. App'x at 468 (citing *Move, Inc. v. Citigroup Glob. Markets, Inc.*, 840 F.3d 1152, 1158 (9th Cir. 2016)). Over the course of the proceedings, the panel made evidentiary and procedural decisions that unduly favored Moonshadow, and unfairly prejudicing L2's ability to put on its case. Those decisions rendered the arbitration fundamentally unfair, and are both individually and cumulatively bases for vacatur under Section 10(a)(3).

#### 1.     Timing

One of the many procedural decisions the panel made during the course of the hearing was how much time each party had available to present their case. For an arbitration to be fundamentally fair, it must provide both parties the opportunity to be heard and to present relevant and material evidence. *U.S. Life Ins. Co.*, 591 F.3d at 1177. That does not mean each

party must have exactly the same amount of time to present its case. But it does mean that the arbitrator must "give each of the parties to the dispute an adequate opportunity to present its evidence and arguments." *Sunshine Min. Co. v. United Steelworkers of Am., AFL-CIO, CLC*, 823 F.2d 1289, 1295 (9th Cir. 1987). Moonshadow's case began the afternoon of August 14—after opening statements—and went until Tuesday morning, August 22.  Given the amount of time Moonshadow had taken putting on its case, the Chief Arbitrator reassured L2 that the impact of Moonshadow's taking its time would only limit Moonshadow's rebuttal case. L2 called as fact witnesses Hiedi Carman, Terra McLaughlin, Paul Wescott, Peter Gabel, and Bobby Hymel, and recalled Mr. Willsie. L2 called as expert witnesses William Holmes and Professor Michael Risch. But despite the Chief Arbitrator's earlier assurances that L2 would be permitted to put on its full case, and despite L2 explaining that it had much more evidence to present, the Chief Arbitrator required L2 to conclude its case in the morning on Friday, August 25, and hurried L2's counsel to complete his case. *See, e.g.,* Hearing Transcript (EAR 3007:24–3008:15). In all, Moonshadow was given more than five days to put on its case while L2 was given only three. This unequal balance of time, L2's expressed need to put on more evidence, combined with the Chief Arbitrator's admonitions to L2's counsel to hurry its presentation along rendered the proceeding fundamentally unfair by depriving L2 of the opportunity to fully present its case.

### 2.    L2's Spoliation Proffer

In litigation that spanned over a year, the parties participated in over 10 formal discovery conferences and exchanged over 20 substantive discovery-related emails or letters. *See* Declaration of James Kilcup Regarding Discovery Matters (EAR 193–202). Both before and during the hearing, Moonshadow alleged that L2 spoliated evidence, in particular the Geo-Visual sales System login data from after May, 20201. *See* EAR 1207:15– 1209:20). Moonshadow did

not move for discovery sanctions, but presented evidence of the alleged spoliation at the hearing. *See* Hearing Transcript (EAR 3162:11–3165:8). In response, L2 offered a declaration to disprove Moonshadow's insinuations. *Id.* While acknowledging that "Mr. Moore somewhat opened this up," the Chief Arbitrator reassured L2 that "the only person on the panel who knows anything about these discovery issues is me. I have not discussed with the panel, you know, any of the motions to compel or any of the orders that resulted or what was alleged and all that sort of thing, and frankly, it's too complicated for me to start now. So I don't really think your proffer is necessary." Hearing Transcript (EAR 3165:9–17). The Chief Arbitrator then turned to the other arbitrators and asked if they "want[ed] to ask anything about some of the discovery stuff that Mr. Moore brought up[.]" Hearing Transcript (EAR 3165:23–25). Arbitrator McCormick responded "no" and so the Chief Arbitrator concluded, "I think the answer is no" and told L2's counsel its proffer was not necessary. Hearing Transcript (EAR 3166:2–4).

This evidentiary decision prejudiced L2 and rendered the arbitration fundamentally unfair because the panel ultimately found against L2 on the spoliation issue, yet had earlier refused to allow it to enter evidence in its own defense. Under Section 10(a)(3), an arbitration is subject to vacatur if the arbitrator(s) "refus[e] to hear evidence pertinent and material to the controversy." Despite rejecting L2's proffer of evidence addressing these issues, in its Opinion, the panel majority found that "L2 erased the Voter Mapping Geo Visual database, thereby eliminating Moonshadow as a competitor of Data Mapping and destroying evidence of L2's use of the Moonshadow technology[.]" *See* Opinion (EAR 8 ¶ 11) (emphasis added). But L2 had offered to present evidence on precisely this issue. Yet, the panel declined to receive it. In fact, the Opinion's finding that L2 had "destroy[ed] evidence of L2's use of the Moonshadow technology" was an incomplete and inaccurate description of the evidence, as L2 had preserved

backups of the GeoViz databases. Declining to receive exonerating evidence and then, on that very issue, rendering a finding against L2, deprived L2 of a fundamentally fair hearing.

      3.    <u>Closing Brief</u>

The panel received Moonshadow's written closing brief but declined to allow L2 to provide one. Under 10(a)(3) the panel was required to "hear evidence pertinent and material to the controversy," and cannot make decisions that prejudice the rights of a party to the arbitration. Once it has given one side the opportunity to present evidence or briefing on an issue, an arbitration panel must extend the opposing side the same opportunity. As part of its closing arguments, Moonshadow provided the panel with an 11-page brief that listed numerous trade secrets and intellectual property cases that the panel and L2 were seeing for the first time. *See* Moonshadow Closing Caselaw Brief (EAR 203–13). L2 objected to this one-sided briefing, saying to the Chief Arbitrator, "I think you know we just received this [brief] at the same time you did and request an opportunity to respond to it." *See* Hearing Transcript (EAR 3402:21–23). The Chief Arbitrator rejected this request, saying "No further briefing." *Id.* (EAR 3403:1–2). The panel was able to consider (and did in fact consider) caselaw Moonshadow had raised for the first time, without an opportunity for L2 to respond. *See* Arbitrator Statement of Outcome and Time Expended for Arbitrator Gaydos (EAR 190). Since the arbitrators considered Moonshadow's closing brief, with no opportunity for L2 to respond, it violated Section 10(a)(3), rendered the arbitration fundamentally unfair and is further basis for vacatur.

      4.    <u>Limiting L2 Testimony</u>

L2 also argues that the Chief arbitrator obstructed key testimony that prevented it from making its case. For example, L2 called its bookkeeper, Terra McLaughlin, to testify about product codes and how L2 had billed certain transactions during the parties' business

relationship. At the evidentiary hearing, Ms. McLaughlin testified that she and another employee, Ms. Arrington, worked together in L2's office for five years, until Ms. Arrington retired in 2021. *Id.* (EAR 2490:20–23). Despite their close working relationship, the Chief Arbitrator prohibited any testimony by Ms. McLaughlin regarding Ms. Arrington's work, despite allowing similar hearsay testimony from Moonshadow witnesses. *Compare* EAR 2515:14– 2516:16 (allocution with Chief Arbitrator about Arrington testimony) *with, e.g.,* EAR 1464:19– 20 (Eimar Boesjes interpreting emails in which L2's software engineers discussed technical processes).

L2 also raises the disparate treatment its chief witness, L2 CEO Bruce Willsie received. At several points, the Chief Arbitrator made and sustained his own objections, preventing Mr. Willsie from commenting on emails that he was not party to, even though the Chief Arbitrator allowed Moonshadow's CEO Mr. Boesjes to do so. EAR 2988:18–2290:24. And, finally, L2 argues the Chief Arbitrator applied different standards to the parties' presentation of expert testimony. L2 offered Professor Michael Risch, established his extensive professional experience in computer programming and database management, as well as decades of experience and extensive scholarship in the law of intellectual property, to testify about norms and expectations for intellectual property in a relationship like that between L2 and Moonshadow. Despite Professor Risch's expertise, the Chief Arbitrator declined to qualify Professor Risch as an expert witness and largely prevented L2 from eliciting relevant testimony from him. *See* Hearing Transcript, EAR 2590:25–2591:18; 2598:1–2599:2, 2626:23–2632:22.

Courts are authorized under the FAA to vacate an arbitration award where the arbitrators declined to hear evidence pertinent and material to the controversy or otherwise prejudiced the rights of either party. 9 U.S.C. § 10(a)(3). Here, the panel's basis for excluding and otherwise

limiting Professor Risch, Mr. Willsie, and Ms. McLaughlin's testimony were not supported by ASP Rules or the evidentiary standards that it applied during Moonshadow's case-in-chief. In doing so, the panel prevented L2 from putting on evidence critical to its defense. Although parties that agree to arbitrate their disputes forfeit many of the procedural safeguards that accompany formal litigation, they do not lose the right to present evidence in their defense. As the FAA makes clear, parties to an arbitration are still entitled to a fundamentally fair hearing. Here, overlaying that substantive right, the parties also expressly contracted for the arbitration to be conducted consistent with ASP rules, and for evidentiary rules to be applied evenhandedly. L2 ultimately received an arbitration that was not consistent with the principles of fundamental fairness and ASP rules. The Court grants L2's motion to vacate on this basis because the panel's evidentiary decisions denied L2 the ability to present relevant evidence, rendering the arbitration fundamentally unfair.[4]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[4] I am mindful of the importance of conducting a fundamentally fair proceeding, in part because of the observations the Oregon Court of Appeals made in reviewing a case over which I presided when serving on the Oregon Circuit Court. While not controlling case law in this case, the court's opinion provided wise instruction that cannot be ignored. *See*, *In the Matter of the Marriage of Justice and Crum*, 265 Or. App. 840 (2014). In that case I took extensive control of the timing for presentation of evidence and I limited the record. While there were off-the-record reasons for my trial management decisions on-the-record, the Court of Appeals appropriately explained how those decisions would have led to a fundamentally unfair hearing. Even a tribunal's interest in efficiently managing a hearing, when overdone, can inevitably lead to a fundamentally unfair hearing.

**CONCLUSION**

For the reasons above, Respondent/Cross-Petitioner L2's Motion to Vacate (ECF Nos. 14 and 18) is GRANTED, the final award of the arbitration panel is VACATED, and Petitioner/Cross-Respondent Moodshadow's Petition For Order Confirming Arbitration Awards (Notice of Removal Ex. A, ECF No. 1) is DENIED. Respondent/Cross-Petitioner L2 is Ordered to submit a proposed judgment consistent with this ruling within 14 days.

DATED this 9th day of December 2024.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (He / Him)
United States District Judge